Scott L. Hansen (12536)
SCOTT L. HANSEN PLLC
2650 Washington Boulevard, Suite 201
Ogden, Utah 84401
Telephone:   801-393-2322
email: scott.l.hansen@gmail.com
*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| **WILLIAM JASON GLENN, and LORILYN GLENN, individually, and as parents and guardians of E.G., a minor child;** | **COMPLAINT**<br><br>**(JURY DEMAND)** |
| **Plaintiffs,**<br><br>**vs.** | **Civil No. 1:19-cv -00008-DAK** |
| **DAVIS SCHOOL DISTRICT, and REID NEWEY, CHADLEY ANDERSON, ADAM KING, BRYON NIELSEN, MURIEL MANN, CINDY SMITH, and TRACIE MCEWEN-GARRITSON, all in both their official and individual capacities;** | **Judge:   Dale A. Kimball** |
| **Defendants.** | |

Plaintiffs William Jason Glenn and Lorilyn Glenn, individually and as parents and legal

guardians of the minor child E.G. hereby complain and allege against the above-named

Defendants as follows:

## INTRODUCTION

1.      This discrimination, retaliation, right to privacy, and failure to train or supervise action is filed by a student, E.G., who was diagnosed with ADHD and mild autism, and his parents against the boy's former school district, school district administrators, and administrators and educators at his former junior high school. When E.G. transferred to the school district, Defendants failed to implement E.G.'s pre-existing 504 Plan within a reasonable time and failed to provide him with specified accommodations. Defendants discriminated against E.G. based on his disability by attempting to force him out of an advanced math class to which he was admitted prior to Defendants knowing of his disability. Defendants retaliated against E.G.'s parents by contacting E.G.'s father's employer to complain about his mother's advocacy on behalf of E.G. and by sharing protected information related to private family matters and E.G.'s disability and education with the employer without authorization. This disclosure of private and protected information was a violation of the parents' right to privacy. Although they were aware of the on-going violations of E.G. and his parents' federally-protected rights, Defendant administrators failed to train or supervise district employees to prevent these violations. Due to the school district's discrimination, retaliation, and hostile educational environment, E.G.'s parents have transferred him and his two siblings to another school. E.G. and his family's lives have been disrupted and they have suffered severe emotional distress and other damages due the Defendants' actions.

## JURISDICTION AND VENUE

2.      This action is brought under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act of 1990 ("ADA"), (42 U.S.C. § 12101, *et seq.*), § 504 of the Rehabilitation Act of 1973 ("Rehab Act"), (29 U.S.C. § 794) and the 14th Amendment of the United States Constitution.

3.      This court has subject matter jurisdiction over the parties under Article III of the United States Constitution and 28 U.S.C. § 1331.

4.      Venue is proper in the District of Utah pursuant to 28 U.S.C. § 1391(b) and (c), because the events giving rise to Plaintiffs' claims occurred in this District and all Plaintiffs and Defendants reside in this District.

## DESCRIPTION OF THE PARTIES

5.      Plaintiff E.G. is a minor child residing in Davis County, State of Utah. At the time of the events underlying these causes of action, E.G. was a student entrusted to the care of Defendant Davis School District and other named Defendants at Fairfield Junior High School.

6.      Plaintiffs William Jason Glenn ("Jason") and Lorilyn Glenn ("Lori"), (collectively "the Glenns") are the parents and legal guardians of the minor child E.G., and are individuals residing in Davis County, State of Utah.

7.      Defendant Davis School District ("DSD") is a Utah public school district, located within the jurisdiction of this court.

8.      DSD receives federal funding for its educational programs and activities.

9.      DSD is a state actor subject to the Fourteenth Amendment's Equal Protection Clause, as enforced through 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act of 1990 ("ADA"), and § 504 of the Rehabilitation Act of 1973 ("Rehab Act").

10.     DSD is a Title II entity under 42 U.S.C. § 12131.

11.     DSD is authorized to operate, and does operate, Fairfield Junior High School ("FFJH"), located in Kaysville, Utah, and is responsible for the conduct of FFJH.

12.     Defendant Reid Newey ("Newey") is the Superintendent of the Davis School District.

Newey has authority and control over the schools in DSD, including their policies, practices, procedures, facilities, maintenance, programs, activities, services, training and employees. Newey is responsible for ensuring that the schools in the DSD comply with anti-discrimination and other applicable laws. Newey is a resident of Utah. Newey is sued in both his official and individual capacities.

13.     Defendant Chadley Anderson ("Anderson") is the Junior High Math Supervisor for DSD and an employee of DSD. Anderson has authority and control over DSD's Junior High Math programs, including placement decisions. Anderson is a resident of Utah. Anderson is sued in both her official and individual capacities.

14.     Defendant Adam King ("King") is the 504 and Special Education Coordinator for DSD and an employee of DSD. King has authority and control over DSD's 504 and Special Education programs, including training and compliance with anti-discrimination laws. King is a resident of Utah. King is sued in both his official and individual capacities.

15.     Defendant Bryon Nielsen ("Nielsen") is the Principal of FFJH, and an employee of DSD. Nielsen has authority and control over FFJH, including supervision of its staff and compliance with anti-discrimination and privacy laws. Nielsen is sued in both his official and individual capacities.

16.     Defendant Muriel Mann ("Mann") is a Vice Principal and 504 Coordinator at FFJH, and an employee of DSD. Mann is sued in both her official and individual capacities.

17.     Defendant Cindy Smith ("Smith") is a mathematics teacher at FFJH, and an employee of DSD.   Smith is sued in both her official and individual capacities.

18.     Defendant Tracie Mcewen-Garritson ("Garritson"), is the Counseling Department Head at

FFJH and an employee of DSD. Garritson is sued in both her official and individual capacities.

## GENERAL ALLEGATIONS

19.     Jason is currently a lieutenant colonel in the Utah Air National Guard.

20.     The Glenns moved to Utah from Florida in the summer of 2017, arriving in Utah on August 9th.

21.     As a military family, the Glenns move frequently and have lived in nine different locations over the past thirteen years.

22.     The Glenns' son, E.G., age 12, and a 7th grader at the time of the events underlying these causes of action, has attended six different schools, most recently in Florida, prior to their move to Utah in 2017.

23.     E.G. was diagnosed with attention deficit hyperactivity disorder ("ADHD") at age four, and with mild autism at age five.

24.     E.G.'s ADHD and mild autism substantially limit the major life functions of learning, concentrating, reading, thinking, planning, organizing, and functions of the brain, among others.

25.     E.G. is an individual with a disability for the purposes of the ADA and § 504.

26.     E.G. has had a § 504 Plan granting him appropriate accommodations since the 3rd grade.

27.     In light of E.G.'s disability, the Bay District, in Florida, where E.G. attended 6th grade, developed a 504 Plan for E.G. which included reasonable accommodations such as seating in an area with least distractions, checking for comprehension, and providing 50% additional time for writing and tests.

28.     Despite his disability, E.G. excels in mathematics and has scored in the 97th to 99th percentile in math on standardized tests. He is passionate about his math studies, had completed

accelerated math classes with top grades while attending school in Florida, and was tracked to take the equivalent of DSD's 9th grade math, Secondary Math I Honors, as a 7th grader.

29.     Prior to moving to Utah, the Glenns researched and specifically selected their home in Kaysville due to its proximity to schools which offered appropriate educational opportunities for their three children.

30.     In July 2017, Lori telephoned FFJH to discuss her son's transfer to the school for the 2017-2018 school year.

31.     On 17 July 2017, Lori emailed FFJH school counselor Tammy Egbert ("Egbert") and informed Egbert that E.G. would be a new 7th grader at FFJH and that they would be moving into their home a few days before school started.

32.     Lori also informed Egbert that E.G. had been in advanced math at his previous school and inquired about requirements for placement in advanced math at FFJH.

33.     On or about 16 August 2017, Lori registered E.G. for school and checked the "504 Plan" box on the registration form. Lori also delivered a sealed envelope containing E.G.'s Florida school records, including his standardized test results and a copy of his 504 Plan, to the FFJH counseling office, and an additional copy of E.G.'s 504 Plan to school personnel.

34.     On 16 August 2017, Lori contacted FFJH and DSD personnel to obtain an appropriate math placement for E.G.

35.     On 16 August 2017, Anderson, the DSD Junior High Math Curriculum Supervisor, authorized placement of E.G. in Secondary I Honors math at FFJH, taught by Smith.

36.     22 August 2017 was the first day of the 2017-2018 school year at FFJH.

37.     After E.G. had attended school for a few weeks, Lori noticed that his general school

performance was uncharacteristically low.

38.     After talking to E.G., Lori realized that FFJH was not providing his 504 accommodations.

39.     On 11 September 2017, Lori visited FFJH and spoke with Mann, 504 Coordinator for FFJH.

40.     In talking to Mann, Lori learned that FFJH personnel had failed to review E.G.'s registration form and educational records and had failed to enter E.G.'s 504 Plan into the FFJH 504 system or otherwise communicate the 504 Plan to its teachers.

41.     During the 11 September 2017 visit, Mann led Lori to the FFJH Counseling Center and with Garritson's assistance located E.G.'s educational records file which included the Florida 504 Plan.

42.     During the 11 September 2017 conversation with Mann, Lori verbally requested that a meeting be held to review the 504 Plan, and that she and Jason be in attendance.

43.     Mann stated that FFJH would review the 504 Plan.

44.     As a result of FFJH's failure to implement, none of E.G.'s teachers were aware of his 504 Plan and no accommodations were given for at least the first three weeks of the school year in any of E.G.'s classes.

45.     DSD policies and the Interstate Compact on Educational Opportunity for Military Children, Utah Code § 53E-3-906(3)(b), require DSD schools to comply with federal anti-discrimination laws by adopting the pre-existing 504 Plan of a transfer student until the local school can evaluate the Plan and determine whether modifications are required.

46.     Even after being informed by Lori, Mann did not enter E.G.'s 504 Plan into the FFJH 504 system, but instead, on 12 September 2017, Mann emailed a list of the Florida 504 Plan

accommodations to E.G.'s teachers and stated that the plan would be followed as "intervention accommodations" until a formal DSD 504 Plan was developed.

47.     On 12 September 2017, after receiving notice of E.G.'s 504 accommodations, math teacher Smith emailed FFJH 504 Coordinator Mann and stated that "[g]iving him extra time on tests should not be an option" for E.G. and "if he is accelerated 2 years ahead and can't keep up with the pace, he has no business being in that class."

48.     On 15 September 2017, in response to an email inquiry from Lori, John Brumbaugh ("Brumbaugh"), E.G.'s Utah Studies teacher, confirmed that he was still unaware of a 504 Plan for E.G. because no 504 Plan had been loaded on the system. Later that day, Brumbaugh sent another email saying that he "checked some emails and found [the 504 Plan]."

49.     On 28 September 2017, Smith emailed Mann asking whether she had to follow E.G.'s 504 accommodations and complaining that E.G. could not keep up with the time limits for quizzes and tests.

50.     Mann responded to Smith that DSD 504 Coordinator Adam King ("King") had told her that E.G.'s 504 must be followed and stated that King's response "isn't one we want necessarily."

51.     In the 28 September email exchange with Mann, Smith admits that E.G. is "doing okay" in class (without accommodations) but complains that "he is almost always the last person to turn in a quiz or test" and that he "doesn't always pay attention," which are conditions directly related to E.G.'s disability and addressed by his 504 accommodations. Smith also states that "[t]wo years ahead of his peers in math should mean he gets finished as fast or faster than the others in the class if this is really the appropriate math class for him to be in. Otherwise I question whether he should be allowed to be 2 years ahead."

52.    On 2 October 2017, Smith emailed Lori regarding E.G.'s 504 Plan. In the email Smith said that she had been notified of the 504 Plan three weeks after the start of school, reported that E.G. currently had a B- grade due to low quiz and test scores (without accommodations), and stated that "if [E.G.] is really qualified to be in a math class two years ahead of his peers, he should not need extra time to complete tasks, quizzes, or tests…" and "he needs to be able to keep up with the pace if he really is qualified to be in this class and not allowed 50% more time as indicated in the 504."

53.    E.G. reported to Lori that Smith had also told him directly that accommodations could not be granted in an honors class and that he would not be allowed to remain in honors math if he could not keep up. E.G. asked Lori "Why can't I have a 504 at this school?" and "Why does my teacher not want to help me?"

54.    On 3 October 2017, Lori phoned and emailed Mann to discuss Smith's failure to honor E.G.'s accommodations and to renew her request for a 504 meeting.

55.    On 4 October 2017, Anderson, along with FFJH school counselor Tammy Egbert ("Egbert"), Smith, and Mann, without notifying the Glenns, pulled E.G. out of band class, took him to the FFJH Counseling Center, and interrogated him regarding his math knowledge and performance in math class.

56.    E.G. was intimidated and traumatized by the meeting and felt that he was singled out because of his disability.

57.    E.G. was worried about his performance on this impromptu and improper evaluation and became concerned that he would not be allowed to remain in the Secondary Honors I math class.

58.    E.G.'s emotional stress was heightened by his autism and self-consciousness regarding his 504 Plan accommodations.

59. On 4 October 2017, Anderson called Lori and informed her that she had met with E.G. earlier that morning. Anderson pressured Lori to have E.G. take the 8th grade end-of-year tests to confirm that he was in the appropriate math class, even though E.G. was achieving at a "B" grade level in Smith's class, without accommodations.

60. On 4 October 2017, Smith emailed Anderson, and stated that "this is so frustrating for me, I know I have to follow the 504, but I am not going to give him extra time in class."

61. On 4 October 2017, Smith emailed Lori to inform her that E.G. would not be given additional time on quizzes and tests in class, but that he would need to come in before or after school if he needed extra time.

62. On 4 October 2017, Jason emailed Sheri Sauve, DSD DEEP (Davis Enhanced Education Programs) Director, requesting clarification on 504 accommodations for extended time in honors classes.

63. On 4 October 2017, Lori spoke with DSD 504 Compliance Officer Adam King ("King") regarding her frustration with FFJH's failure to provide 504 accommodations and DSD lack of responsiveness in addressing issues surrounding E.G.'s education.

64. On 5 October 2017, after attempting to contact Principal Nielson, who was on vacation, Lori called DSD Superintendent Newey's office and requested to talk to Newey about E.G.'s situation. Newey's assistant referred Lori to other DSD administrators and would not allow her to speak directly to Newey.

65. On 3 October 2017, in response to an email inquiry from Lori, Brooke Anderson, E.G.'s Honors English teacher, confirmed that she had received E.G.'s 504 Plan. Then, on 6 October 2017, she stated that she had checked her files carefully, and that she, in fact, had not received

E.G.'s 504 Plan. Later that day Brooke Anderson emailed to say that she had located and read E.G.'s 504 plan and had implemented the accommodations.

66.     On 5 October 2017, in response to an email inquiry from Lori, Deanna Wilson, E.G.'s College and Career Awareness teacher, confirmed that she was not aware of a 504 Plan for E.G. and that there was none in the system.

67.     On 6 October 2017, Newey called Lori to discuss her concerns regarding DSD's treatment of E.G. and requested that she meet with DSD Junior High Director David Tanner. Later that day Lori exchanged emails with Tanner and spoke with him by phone, again explaining the entire situation.

68.     On 6 October 2017, in response to an email from Lori, Elisabeth Meyers ("Meyers"), E.G.'s Honors Science teacher, reported that there was no 504 Plan in the system for E.G. and that no plan was in her 504 Folder. Later that day, Meyers emailed to say that she had received an email with accommodations for E.G.

69.     Many of E.G.'s teachers were not aware of E.G.'s 504 Plan and had not implemented its accommodations more than 6 weeks after the start of school.

70.     On 6 October 2017, Lori sent an email to Smith, with copies to several FFJH and DSD personnel, which expressed her extreme frustration with the many ways in which E.G.'s situation had been mishandled and stated that "[w]e will see that every individual who has been involved in all of this regarding our son will answer for it."

71.     On Sunday, 8 October 2017, Garritson emailed FFJH personnel and requested copies of all emails from the Glenns to help Garritson prepare for a meeting FFJH personnel had arranged with the military liaison.

72.     On 9 October 2017, the Glenns met with FFJH Principal Nielsen and once again reviewed the entire situation regarding E.G. and requested assistance in resolving on-going problems.

73.     On 12 October 2017, Garritson telephoned Technical Sergeant Amber Monio ("TSgt Monio"), the Public Affairs Officer at Roland Wright Air National Guard Base where Jason is employed, reported that FFJH was having a difficult time with a military family [the Glenns], and falsely represented that Lori was sending threatening emails to DSD and that the police were involved. Garritson left her home telephone number in addition to her work contact information.

74.     On 13 October 2017, Garritson provided TSgt Monio with multiple emails and statements from the Glenns and FFJH and DSD personnel, along with a detailed and self-serving narrative of her interactions with the Glenns, which included accusations of harassment and threats.

75.     On 15 October 2017, Mann sent numerous additional emails to TSgt Monio at Jason's place of employment.

76.     The emails sent by Garritson and Mann to TSgt Monio contained private and protected information including, but not limited to, information regarding E.G.'s disability status and his educational records.

77.     After receiving Garritson's call and the emails from Mann and Garritson, TSgt Monio immediately informed Jason's superior officers including the Wing Commander, of the allegations against the Glenns.

78.     Jason had recently started his new job in Utah and was not well-acquainted with his superior officers.

79.     Garritson's and Mann's contact with Jason's employer raised questions about his fitness for the position he was serving in and jeopardized Jason's standing at work. As a result of the

contacts, he was compelled to explain personal details regarding his family and the situation at FFJH on multiple occasions to superior officers he had just met and to other Base personnel.

80.    On 10 November 2017, a 504 meeting was held at FFJH and a 504 plan virtually identical to the one implemented in Florida was put in place for E.G.

81.    Throughout October, November, and December 2017, E.G. suffered from increasing anxiety and his attitude toward school and school performance continued to decline.

82.    Because of the events described herein, the Glenns felt extremely uncomfortable in their interactions with FFJH and DSD personnel and began making applications to place E.G. in another school.

83.    After several months, E.G. obtained a placement in another school and on 11 January 2018 the Glenns withdrew E.G. from FFJH and enrolled him in school located approximately 10 miles from their home.

84.    The Glenns also withdrew E.G.'s two siblings from DSD schools due to DSD's retaliation, accusations, and the animosity they feel from DSD personnel.

85.    Due to the change of schools, the Glenns have experienced scheduling difficulties, and have incurred expenses for commuting, and school uniforms.

86.    Due to their adverse interactions with DSD personnel, the Glenns are not comfortable with re-enrolling their children in DSD schools.

87.    After enrollment, E.G. completed the highest math class offered by his new school while in 7th grade.    The school only offers more advanced math classes in an online format which is not appropriate for E.G., and the Glenns are anticipating a move to Salt Lake City where E.G. and his siblings can attend private schools with appropriate class options.

88.    As a result of Defendants' conduct, E.G., Lori, and Jason suffered severe or extreme emotional distress.

89.    Among other effects, E.G. became averse to attending school, developed a mistrust of teachers, and suffered from declining grades, insomnia, anxiety, feelings of inadequacy, anger, frustration, gastrointestinal issues, and uncontrollable crying episodes; all due to Defendant's conduct.

90.    Among other effects, Lori has suffered from agitation, insomnia, headaches, gastro-intestinal distress, anxiety, and relationship problems; all due to Defendant's conduct.

91.    Among other effects, Jason has suffered from anxiety, concerns about the security of his job, insomnia, gastro-intestinal distress, and relationship problems; all due to Defendant's conduct.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of Section 504)
### (E.G. against DSD)

92.    Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1 through 91 above, as if set forth here in full.

93.    Section 504 of the Rehabilitation Act of 1973 ("§ 504"), and its implementing regulations prohibit discrimination against persons with disabilities. § 504 prohibits the exclusion from participation in, or being denied benefits of, or being subjected to discrimination under any program or activity receiving federal financial assistance. *See* 29 U.S.C. § 794.

94.    DSD receives federal funds for its education programs and is a qualified "program or activity" under 29 U.S.C. § 794.

95.    E.G. has been diagnosed with ADHD and mild autism and is a qualified individual with a

disability within the meaning of the ADA and the Rehabilitation Act. *See* 42 U.S.C. § 12102(1); 29 U.S.C. § 705(20)(B).

96.    At all relevant times, DSD knew or should have known of E.G.'s disability, and such knowledge informed DSD's interactions with E.G. and the Glenns.

97.    E.G. was denied the benefits of accommodations awarded to him under his 504 Plan when FFJH teachers were not timely made aware of his pre-existing 504 Plan.

98.    E.G. was denied the benefits of accommodations awarded to him under his 504 Plan when FFJH did not timely hold a 504 meeting to develop an FFJH 504 Plan.

99.    E.G. was denied the benefits of accommodations awarded to him under his 504 Plan when, after being made aware of his 504 Plan, Smith refused to allow him extra time for assignments and tests.

100.    E.G. was subjected to discrimination due to his disability and a hostile educational environment when DSD, including Anderson, Mann, and Smith, repeatedly attempted to have him removed from Smith's Secondary I Honors math class.

101.    E.G. was subjected to discrimination due to his disability and a hostile educational environment when Anderson, Mann, Egbert, and Smith summoned him to a private meeting and interrogated him about his math knowledge and performance in Smith's Secondary I Honors math class.

102.    E.G. was subjected to discrimination due to his disability when, after learning of E.G.'s 504 Plan, Anderson pressured Lori to have E.G. take the 8th grade end-of-year tests to confirm that he was in the appropriate math class, even though E.G. was achieving at a "B" grade level in Smith's class, without accommodations.

103.    Smith's discriminatory intent was evidenced by her statements to Lori that E.G. should choose between enrollment in the advanced Secondary I Honors math class or being granted his accommodations.

104.    Discriminatory intent was further evidenced when FFJH 504 Coordinator Mann, after DSD 504 Coordinator King told her that E.G.'s 504 plan must be followed, wrote to Smith that King's response "isn't one we want necessarily."

105.    Discriminatory intent was further evidenced when Smith made statements directly to E.G. regarding the unavailability of accommodations in her honors math class.

106.    DSD and Mann acted in bad faith and exhibited deliberate indifference to the needs of E.G. by failing to ensure implementation of his 504 accommodations in a timely manner.

107.    DSD and Smith acted in bad faith and exhibited deliberate indifference by willfully refusing to implement E.G.'s 504 accommodations.

108.    DSD and Anderson acted in bad faith and exhibited deliberate indifference after they became aware of E.G's 504 accommodations by attempting to have him specially tested and potentially removed from honors math.

109.    DSD's denial of benefits and discrimination against E.G. was by reason of his disability.

110.    As a direct and proximate result of DSD's violations of § 504, E.G. has suffered special and general damages, including severe emotional distress, in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
**(Discrimination in Violation of Title II)**
**(E.G. against DSD)**

111.    Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1 through 110 above, as if set forth here in full.

112.    Title II of the ADA and its implementing regulations forbid public entities, including

local educational agencies, to exclude or deny people with disabilities the benefits of its services,

programs, or activities, or to discriminate based on disability. *See* 42 U.S.C. § 12132.

113.    Prohibited disability-based discrimination by public entities includes the failure to

provide qualified individuals with disabilities an equal opportunity to participate in or benefit

from aids, benefits, or services or "otherwise limit" a qualified individual with a disability in the

enjoyment of any right, privilege, aid, benefit or service. *See* 28 C.F.R. § 35.130(b)(1)(ii) and

(vii).

114.    Prohibited discrimination additionally includes the failure to make reasonable

modifications as necessary to avoid discrimination against an individual based on their disability.

*See* 28 C.F.R. § 35.130(b)(7).

115.    DSD is a public entity forbidden to discriminate based on disability. *See* 42 U.S.C §

12132.

116.    E.G. was at all relevant times, a qualified individual with a disability as defined by the

ADA.

117.    At all relevant times, DSD knew or should have known of E.G.'s disability, and such

knowledge informed DSD's interactions with E.G. and the Glenns.

118.    DSD illegally discriminated against E.G. in its continuing refusal to reasonably

accommodate E.G. as a person with a disability.

119.    DSD's discrimination was intentional as DSD refused to accommodate E.G. despite

having full knowledge that he is a qualified individual with a disability, and that he was in need

of, and had been granted, reasonable accommodations.

120.    E.G. was denied the benefits of accommodations awarded to him under his 504 Plan when FFJH did not timely hold a 504 meeting to develop an FFJH 504 Plan.

121.    E.G. was denied the benefits of accommodations awarded to him under his 504 Plan when FFJH teachers were not timely made aware of his pre-existing 504 Plan.

122.    E.G. was denied the benefits of accommodations awarded to him under his 504 Plan when, after being made aware of his 504 Plan, Smith refused to allow him extra time for assignments and tests.

123.    E.G. was subjected to discrimination due to his disability and a hostile educational environment when DSD, including Anderson, Mann, and Smith, repeatedly attempted to have him removed from Smith's Secondary I Honors math class.

124.    E.G. was subjected to discrimination due to his disability and a hostile educational environment when Anderson, Mann, Egbert, and Smith summoned him to a private meeting and interrogated him about his math knowledge and performance in Smith's Secondary I Honors math class.

125.    E.G. was subjected to discrimination due to his disability and a hostile educational environment when, after learning of E.G.'s 504 Plan, Anderson pressured Lori to have E.G. take the 8th grade end-of-year tests to confirm that he was in the appropriate math class, even though E.G. was achieving at a "B" grade level in Smith's class, without accommodations.

126.    Smith's discriminatory intent was evidenced by her statements to Lori that E.G. should choose between enrollment in the advanced Secondary I Honors math class or being granted his accommodations.

127.    Discriminatory intent was further evidenced when FFJH 504 Coordinator Mann, after

DSD 504 Coordinator King told her that the E.G. must be given accommodations in Smith's class, wrote to Smith that King's response "isn't one we want necessarily."

128.    Discriminatory intent was further evidenced when Smith made statements directly to E.G. regarding the unavailability of accommodations in her honors math class.

129.    DSD and Mann acted in bad faith and exhibited deliberate indifference to the needs of E.G. by failing to implement his 504 accommodations in a timely manner.

130.    DSD and Smith acted in bad faith and exhibited deliberate indifference by willfully refusing to implement E.G.'s 504 accommodations.

131.    DSD and Anderson acted in bad faith and exhibited deliberate indifference after they became aware of E.G's 504 accommodations by attempting to have him specially tested and potentially removed from honors math.

132.    DSD's denial of benefits and discrimination against E.G. was by reason of his disability.

133.    As a direct and proximate result of these violations of Title II, E.G. has suffered special and general damages, including severe emotional distress, in an amount to be proven at trial.

<u>**THIRD CAUSE OF ACTION**</u>
**(Retaliation under Section 504 and Title II)**
**(Jason and Lori against DSD, Anderson, Mann, Smith and Garritson)**

134.    Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1 through 133 above, as if set forth here in full.

135.    Both § 504 and Title II of the ADA prohibit retaliation against any person who has advocated on behalf of a child's education.

136.    The Glenns advocated on behalf of E.G.'s education, asserted E.G.'s rights under § 504, requested that reasonable accommodations granted to E.G. under § 504 be implemented, and

complained to DSD and FFJH personnel regarding discriminatory actions against E.G.

137. The Glenns' efforts to advocate for E.G. and their requests and complaints to DSD and FFJH on his behalf were protected activities under § 504 and Title II.

138. DSD, including Anderson, Mann, Smith and Garritson, were aware that the Glenns had engaged in protected activity.

139. DSD, including Anderson, Mann, Smith and Garritson, took adverse action targeted against the Glenns that was in temporal proximity to the Glenns engaging in protected activity.

140. DSD personnel, including Anderson, Mann, Smith and Garritson, prepared statements containing private and protected information with the intent that their statements would be shared with Jason's employer.

141. DSD, through Mann and Garritson, contacted Jason's employer and complained and made false allegations against the Glenns.

142. DSD, through Mann and Garritson, shared details of the Glenn's private lives, information regarding E.G.'s disability, and protected educational information with Jason's employer without authorization.

143. The adverse action of contacting Jason's work by DSD, including Mann and Garritson, was connected to the Glenns' protected activities.

144. The adverse action of contacting Jason's work by DSD was sufficient to dissuade a reasonable person from engaging in advocacy.

145. DSD's adverse action caused the Glenns to suffer severe emotional distress.

146. Mann and Garritson's contact with Jason's employer raised questions about his fitness for the position he was serving in, and jeopardized Jason's standing at work. As a result of the

contacts, Jason was compelled to explain personal details regarding his family, his son's disability, private educational information, and the situation at FFJH to superior officers he had only recently met.

147.    As a further result of Defendants' contacts with Jason's employer, the Glenns suffered humiliation and embarrassment, mental anguish, severe anxiety, disruption of their personal lives, and loss of enjoyment of the pleasures of everyday life.

148.    As a direct and proximate result of Defendants' retaliation, Plaintiffs have suffered special and general damages, including severe emotional distress, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Violation of Privacy Rights under Section 1983 and the 14th Amendment)
### (All Plaintiffs against DSD, Anderson, Mann, Smith and Garritson)

149.    Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1 through 148 above, as if set forth here in full.

150.    The 14th Amendment provides, "nor shall any State deprive any person of…liberty… without due process of law." U.S. Const. Amend. XIV, § 1.

151.    The United States Supreme Court has found that a constitutional "right of privacy…[is] founded in the Fourteenth Amendment's concept of personal liberty." *Roe v Wade*, 410 U.S. 113, 153.

152.    The United States Supreme Court has stated that one type of constitutionally protected right "is the individual interest in avoiding disclosure of personal matters."  *Whalen v. Roe*, 429 U.S. 589, 599.

153.   FERPA prohibits the release of education records or personally identifiable information of students without the written consent of their parents.   *See* 20 U.S.C. 1232g(b).

154.   Plaintiffs were deprived of their right to privacy when DSD, through Anderson, Mann, Smith and Garritson, disclosed private and protected information regarding E.G.'s disability and education records, and the Glenn's interactions with DSD to Jason's employer.

155.   Plaintiffs had a reasonable expectation that their private information would be protected, because the information is, in part, education records which are protected under FERPA.   *See* 20 U.S.C. 1232g.

156.   Defendants' disclosure of Plaintiffs' private information was undertaken with malicious intent to injure Plaintiffs.

157.   At all times relevant herein, Defendants acted under color of state law.

158.   As a direct and proximate result of Defendants' actions, Plaintiffs have suffered special and general damages, including severe emotional distress, in an amount to be proven at trial.


### FIFTH CAUSE OF ACTION
#### (Failure to Train or Supervise under Section 1983)
#### (All Plaintiffs against DSD, Newey, King, and Nielsen)

159.   Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1 through 158 above, as if set forth here in full.

160.   DSD, including Newey, King, and Nielsen, had a duty to protect Plaintiffs' federally-protected rights.

161.   The actions taken by DSD employees, including Anderson, Mann, Smith and Garittson, violated Plaintiffs' federal rights of protection against discrimination, retaliation, and invasion of

privacy.

162.    The actions by DSD employees, including Anderson, Mann, Smith and Garritson, in violation of Plaintiffs' federally-protected rights were a result of Newey, King and Nielsen's failure to adequately train or supervise.

163.    DSD, including Newey, King and Nielsen failed to provide adequate training to Anderson, Mann, Smith and Garritson regarding federal prohibitions against discrimination due to disability.

164.    DSD, including Newey, King and Nielsen failed to provide adequate training to Anderson, Mann, Smith and Garritson regarding privacy rights, including FERPA.

165.    DSD, including Newey, King and Nielsen, failed to provide training adequate training to Mann regarding her responsibilities as FFJH 504 Coordinator.

166.    The failure to train by DSD, including Newey, King and Nielsen, was an omission that manifests deliberate indifference to the rights of Plaintiffs.

167.    DSD, including Newey, King, and Nielsen, failed to adequately supervise Anderson, Mann, Smith and Garritson.

168.    DSD, including Newey, King, and Nielsen, knew or should have known that Anderson, Mann, Smith and Garritson were acting in violation of Plaintiffs' federally protected rights.

169.    DSD, including Newey, King and Nielsen, failed to prevent Smith, Mann, and Garritson from acting in violation of Plaintiffs' federally protected rights.

170.    The failure to adequately supervise by DSD, including Newey, King and Nielsen, was an omission that manifested deliberate indifference to the rights of DSD students, including E.G.

171.    The failure to adequately supervise by DSD, including Newey, King and Nielsen, was an

omission that manifested deliberate indifference to the rights of Lori and Jason.

172.    Adequate training or supervision would have prevented the violation of the rights of E.G., Lori, and Jason.

173.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered special and general damages, including emotional distress, in an amount to be proven at trial.

## JURY DEMAND

Plaintiffs respectfully request a jury trial on all issues triable to a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.    For a judgment in the amount of Plaintiffs' damages, as described above and as proven at trial; and

2.    For punitive damages, as allowed by law, due to Defendants' willful and malicious conduct, or conduct that manifests a knowing and reckless indifference toward and disregard of, the rights of others; and

3.    For an award of Plaintiff's costs and attorneys' fees incurred herein, as allowed by law; and

4.    For such other further relief as the Court deems appropriate.


DATED, this 1st day of February 2019.


   /s/ Scott L. Hansen
   SCOTT L. HANSEN
   *Attorney for the Plaintiffs*

24