# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **WILLIAM JASON GLENN, and LORILYN GLENN, individually, and as parents and guardians of E.G., a minor child,**<br><br>           **Plaintiffs,**<br><br>**v.**<br><br>**DAVIS SCHOOL DISTRICT, and REID NEWEY, CHADLEY ANDERSON, ADAM KING, BRYON NIELSEN, MURIEL MANN, CINDY SMITH, and TRACIE MCEWEN-GARRITSON, all in both their official and individual capacities,**<br><br>           **Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No. 1:19-cv-00008-DAK**<br><br>**Judge Dale A. Kimball** |

This matter is before the court on Defendants Davis School District, Reid Newey, Chadley Anderson, Adam King, Bryon Nielsen, Muriel Mann, Cindy Smith, and Tracie McEwen-Garritson's Motion to Dismiss Plaintiffs William Jason Glenn, Lorilyn Glenn, and E.G.'s Third, Fourth, and Fifth Causes of Action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The court held a hearing on the Motion on October 15, 2019. At the hearing, Defendants were represented by Diana F. Bradley and Rachel G. Terry, and Plaintiffs were represented by Scott L. Hansen. The court took the matter under advisement. The court considered carefully the memoranda and other materials submitted by the parties, as well as the law and facts relating to the Motion. Now being fully advised, the court issues the following Memorandum Decision and Order.

# BACKGROUND

In the summer of 2017, Jason ("Mr. Glenn"), Lorilyn ("Mrs. Glenn"), and E.G. (collectively, the "Glenns") moved from Florida to Utah for Mr. Glenn's job. Mr. Glenn is a member of the military and is currently a lieutenant colonel in the Utah Air National Guard. When the Glenns relocated to Utah, their twelve-year-old son, E.G., was about to begin seventh grade as a new student at Fairfield Junior High School (the "School"), which is operated by the Davis School District (the "District"). When E.G. was younger, he was diagnosed with attention deficit hyperactivity disorder ("ADHD") and mild autism, which constitute disabilities for purposes of Title II of the Americans with Disabilities Act of 1990 ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("RA"). Due to these medical conditions, E.G. has had a school 504 plan in place since the third grade that allows for certain accommodations to assist him in the learning environment. Most recently, the school that E.G. attended in Florida for sixth grade developed a 504 plan (the "Florida 504 Plan") that included accommodations such as seating in an area with less distractions, checking for comprehension, and providing additional time for writing and tests. Despite his disability, E.G. excels in math and has scored extremely high in math on standardized tests.

In July 2017, Mrs. Glenn telephoned the School to discuss E.G's transfer there for the upcoming school year. Mrs. Glenn also emailed a counselor at the School and informed her that E.G. would be a new student there. In addition, Mrs. Glenn informed the counselor that E.G. had been in advanced math at his previous school, and she inquired about the requirements to be placed in advanced math at the School. Eventually, in August 2017, Mrs. Glenn registered E.G. for school and checked a box on the registration form that indicated that E.G. had a 504 plan. She also delivered a sealed envelope containing E.G.'s Florida school records and a copy of the

Florida 504 Plan to the School's counseling office. Once E.G. was registered, Chadley Anderson ("Anderson"), the District Junior High Math Curriculum Supervisor, authorized E.G's placement into the "Honors 2" math class, a course two years ahead of the typical placement for seventh graders, which was taught by Cindy Smith ("Smith").

A few weeks into the school year, Mrs. Glenn noticed that E.G's general school performance was uncharacteristically low. After discussing the issue with E.G., Mrs. Glenn realized that the School was not providing him with his 504 plan accommodations. As a result, Mrs. Glenn spoke with Muriel Mann ("Mann"), the Schools' 504 coordinator and Vice Principal, to see why the School was not implementing the Florida 504 Plan. In her discussion with Mann, Mrs. Glenn learned that the School had not reviewed E.G.'s registration form, failed to enter the Florida 504 Plan into the School's system, and failed to communicate the plan to E.G.'s teachers. Nevertheless, Mann informed Mrs. Glenn that the School would evaluate the Florida 504 Plan by implementing the accommodations for approximately four weeks. Thereafter, the School would meet with the Glenns to evaluate and modify the accommodations to ensure E.G.'s success at the School. Because the District's policy dictates that a 504 plan from another district should not be entered into the District's computer system, Mann simply emailed E.G.'s teachers and directed them to implement the Florida 504 Plan.

After receiving Mann's email, E.G.'s math teacher, Smith, responded and argued that giving E.G. extra time on tests should not be allowed. Smith further opined that if E.G. could not keep up with the pace, then "he ha[d] no business being in that class." Furthermore, Smith directly expressed to E.G. that she could not provide him with accommodations in an honors math class and that she would not allow him to remain in the math class if he was unable to keep up.

Some of E.G.'s other teachers, however, failed to respond to Mann's email. In fact, after her conversation with Mann, Mrs. Glenn reached out to E.G.'s other teachers to see if they were implementing the Florida 504 Plan. To her dismay, several of the teachers responded that they were unaware of the Florida 504 Plan and so had failed to implement it.

In early October 2017, Mrs. Glenn again contacted Mann to request a meeting and discuss Smith's failure to honor the Florida 504 Plan. Around that same time, Anderson, Smith, Mann, and a school counselor, pulled E.G. out of one of his classes, without the knowledge of Mr. or Mrs. Glenn, to question him regarding his math knowledge and performance in math class. This impromptu meeting caused E.G. a significant amount of stress and uncertainty as he became worried that the School would not allow him to remain in Honors 2 math. Subsequently, Anderson contacted Mrs. Glenn and suggested that E.G. take a test to confirm that he was in the right math class, and Smith contacted Mrs. Glenn to inform her that E.G. would not be given extra time on quizzes and tests but would be required to come in before or after school if he needed additional time. In turn, Mrs. Glenn contacted Adam King ("King"), the District's 504 Compliance Officer, to express her frustration with the School's failure to implement the Florida 504 Plan. She also attempted to contact Bryon Nielsen ("Nielsen"), the School's Principal, but he was on vacation. Because she was unable to contact Nielsen, Mrs. Glenn instead contacted Reid Newey ("Newey"), the District Superintendent, to discuss E.G.'s situation. Newey's assistant directed Mrs. Glenn to communicate with other District employees but did not allow her to speak with Newey directly. Eventually, Mrs. Glenn sent an email to various School and District administrators in which she strongly expressed her frustration with E.G.'s school experience.

On October 8, 2017, Trace McEwen-Garritson ("Garritson"), the School's Counseling Department Head, emailed E.G.'s teachers and several administrators and requested copies of all emails from the Glenns in anticipation of a meeting that the School had arranged with a military liaison in order to discuss the School's situation with the Glenns. A few days later, Garritson contacted Technical Sergeant Amber Monio ("TSgt Monio"), a public affairs officer at Roland Wright Air National Guard Base where Mr. Glenn was employed, to report the difficult interactions that School and District employees were having with the Glenns. In that conversation, Garritson stated that Mrs. Glenn was sending threatening emails to the District and that the police were involved. Garritson and Mann subsequently emailed TSgt Monio and provided her with copies of emails from the Glenns, which also included private information regarding E.G.'s disability status and his educational records. TSgt Monio, in turn, informed Mr. Glenn's superior officers of the information she had received. Mr. Glenn's superior officers then asked him about the situation, and Mr. Glenn was forced to explain the circumstances and provide personal details regarding his family.

By November 2017, the School held a meeting in which it decided on and implemented a 504 plan for E.G. that was nearly identical to the Florida 504 Plan. Nevertheless, Mr. and Mrs. Glenn no longer felt comfortable with the School, and in January 2018, they enrolled E.G. in a different school.

The Glenns filed the instant suit on February 1, 2019 and raised five causes of action: (1) discrimination in violation Section 504 of the RA (asserted by E.G. against the District); (2) discrimination in violation of Title II of the ADA (asserted by E.G. against the District); (3) retaliation under Section 504 and Title II (asserted by Mr. and Mrs. Glenn against Anderson, Mann, Smith, Garritson (collectively, the "Individual Defendants"), and the District); (4)

violation of privacy rights under 42 U.S.C. § 1983 and the Fourteenth Amendment (asserted by the Glenns against the Individual Defendants and the District); and (5) failure to train or supervise under 42 U.S.C. § 1983 (asserted by the Glenns against Newey, King, Nielsen (collectively, the "Supervisor Defendants"), and the District).

## DISCUSSION

Defendants now move to dismiss the Glenns' Third, Fourth, and Fifth Causes of Action for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (quotation marks omitted). "[A]ll well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Acosta v. Jani-King of Oklahoma, Inc.*, 905 F.3d 1156, 1158 (10th Cir. 2018) (quoting *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006)). "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## I. Retaliation Claim

The Glenns bring their retaliation claim under both Title II of the ADA and Section 504 of the RA. In order to prosecute a retaliation claim under either statute, "a plaintiff need not show that [he or she] suffers from an actual disability." *Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249, 1264 (10th Cir. 2001). Rather, "a reasonable, good faith belief that the statute[s]

ha[ve] been violated suffices." *Id.* The ADA's anti-retaliation provision, which applies to but is not specifically contained in Title II, provides:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203. Similarly, Section 504 incorporates the anti-retaliation provision of Title VI of the Civil Rights Act of 1964, 29 U.S.C. § 729a(2), which provides:

> No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the [Civil Rights Act] or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part.

34 C.F.R. § 100.7(e). Because the two anti-retaliation provisions are functionally the same, courts analyze claims under either statute using the same framework. *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010). To state a prima facie case for retaliation, plaintiffs must show "(1) that [they] engaged in protected activity; (2) that [they] suffered a materially adverse action . . . either after or contemporaneous with [their] protected activity; and (3) a causal connection between the protected activity and the adverse action."[1] *Id.* In this context, an adverse action is an action taken by an individual that "might have dissuaded a reasonable [person] from making or supporting a charge of discrimination." *Duvall v. Putnam City Sch. Dist., Indep. Sch. Dist. No. 1 of Oklahoma Cty.*, 530 F. App'x 804, 810 (10th Cir. 2013) (quoting *Reinhardt*, 595 F.3d at 1133). Courts have opined that an alleged adverse action must have "caused more than '*de minimis* harm' to or a '*de minimis* impact' upon" the individual engaging in the protected activity. *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1040 (10th

---

[1] Although the majority of ADA retaliation cases that apply the three elements above arise in the employment context under Title I, courts analyze and apply the same three elements for retaliation claims arising in the public services context under Title II. *See, e.g.*, *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 (11th Cir. 2003).

Cir. 2011).  As for the third element, "[c]ausal connection may be established by producing 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'"  *Reinhardt*, 595 F.3d at 1134 (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006)).

Preliminarily, Defendants do not contest that Mr. and Mrs. Glenn engaged in protected activity by advocating on behalf of E.G. and requesting that the School implement the Florida 504 Plan.  Nor could they make such an argument.  Indeed, the Complaint contains ample allegations demonstrating that Mr. and Mrs. Glenn engaged in protected activity.  The court therefore concludes that Mr. and Mrs. Glenn have properly alleged the first element of their retaliation claim.

As for the remaining elements, Defendants' contentions can be distilled down to four arguments: (1) Mr. and Mrs. Glenn have failed to adequately allege that they suffered an adverse action that resulted in more than *de minimis* harm; (2) Mr. and Mrs. Glenn have failed to establish a causal connection between the protected activity and the adverse action; (3) neither the ADA nor the RA allow for suits against Defendants in their individual capacities; and (4) even if Mr. and Mrs. Glenn have stated a claim for retaliation, they have failed to do so with respect to Anderson and Smith.  The court will address each argument in turn.

First, Mr. and Mrs. Glenn contend that they suffered an adverse action because of their zealous advocacy on behalf of E.G.  Specifically, Mr. and Mrs. Glenn aver that Garritson contacted various District personnel for copies of all correspondence with Mr. and Mrs. Glenn in order to share that information with Mr. Glenn's employer.  In response to that request, District personnel (1) forwarded Garritson email exchanges that they had with Mr. and Mrs. Glenn that contained confidential information such as E.G.'s name, educational record, and disability status

and (2) drafted prepared statements that placed the Glenns in a bad light with the intent that such statements be shared with Mr. Glenn's employer. After collecting this information, Mr. and Mrs. Glenn allege that Garritson contacted TSgt Monio and claimed that the Glenns had been threatening Defendants and that the police were involved. Further, they allege that Garritson forwarded all the information she had collected to TSgt Monio, and that over the following days, Garritson and Mann communicated with TSgt Monio on several occasions and sent her additional information. After receiving this information, Mr. and Mrs. Glenn contend that TSgt Monio immediately shared it with Mr. Glenn's superior officers. In turn, Mr. Glenn's superior officers approached him, and he was forced to explain the situation and divulge personal details about his family.

Based on these facts, the court concludes that Mr. and Mrs. Glenn have adequately alleged that they suffered an adverse action that resulted in more than *de minimis* harm. The District's actions in contacting Mr. Glenn's employer—a third party completely unrelated and uninvolved in the situation—would likely "dissuade[] a reasonable [person] from making or supporting a charge of discrimination." *Duvall*, 530 F. App'x at 810. Given the Glenns' recent move to Utah, such actions undoubtedly placed Mr. Glenn in a very uncomfortable situation and forced him to share details of his life with his superior officers with whom he was not well-acquainted. Moreover, Garritson's claim that Mr. and Mrs. Glenn were threatening District personnel and that the police were involved would potentially give pause to Mr. Glenn's employers regarding Mr. Glenn's character and jeopardize his standing at work. Accordingly, Mr. and Mrs. Glenn have adequately alleged that they suffered an adverse action.

Second, the court likewise finds that Mr. and Mrs. Glenn have sufficiently pleaded a causal connection between their protected activity and the adverse action. To start, Mr. and Mrs.

Glenn advocated on behalf of E.G. from August through November 2017, and the adverse action took place in October 2017. Thus, the Glenns' protected conduct was closely followed by and occurred simultaneous with the adverse action. Yet, even without the temporal proximity between the protected conduct and the adverse action, the circumstances of this case give rise to an inference of retaliatory motive. Defendants have not suggested, nor can the court conceive at this juncture of the case, a well-founded reason for contacting Mr. Glenn's employer regarding E.G.'s situation. That the District contacted not only an unconnected third party, but a third party that was Mr. Glenn's new employer, gives rise to an inference that the District acted in retaliation to Mr. and Mrs. Glenn's advocacy. Therefore, by accepting the allegations in the Complaint as true, the court concludes that Mr. and Mrs. Glenn have properly alleged a causal connection. Accordingly, Mr. and Mrs. Glenn have stated a plausible claim for retaliation under both Title II and Section 504 against the District.

Third, Defendants contend that even if the Glenns have stated a claim for retaliation against the District, they cannot do so against the Individual Defendants because there is no individual liability under Title II or Section 504. At the outset, the Glenns assert their retaliation claim against the Individual Defendants in both their official and individual capacities. Yet, because a suit against a defendant in his or her official capacity is simply another way of stating a claim against the entity of which he or she is an agent, the Glenns' claim against the Individual Defendants in their official capacities must be dismissed because they have simultaneously sued the District. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). In addition, the Glenns conceded at oral argument, and the majority of courts have decided, that there exists no individual liability under Section 504 of the RA. *E.g., U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605–07 (1986) ("Congress limited the scope of § 504 to those who actually 'receive' federal

financial assistance . . . . The statute covers those who receive the aid, but does not extend as far as those who benefit from it."). Consequently, the court grants Defendants' motion on the Glenns' claim for retaliation against the Individual Defendants based on the RA.

Individual liability for retaliation under Title II of the ADA, on the other hand, is a far-from-settled issue. The Tenth Circuit has yet to address it. For the courts that have addressed it, there exists a significant split in authority on whether a defendant can be held individually liable for retaliation in the public services context under Title II. *Compare Shotz*, 344 F.3d at 1179–80 (holding there is individual liability for retaliation under Title II), *and Datto v. Harrison*, 664 F. Supp. 2d 472, 486–92 (E.D. Pa. 2009) (same), *with Baird ex rel. Baird v. Rose*, 192 F.3d 462, 471–72 (4th Cir. 1999) (holding there is no individual liability under Title II), *and N.T. v. Espanola Pub. Sch.*, No. CIV 04-0415 MCA/DJS, 2005 WL 5840479, at *14 (D.N.M. May 20, 2005) (same). Of the multitude of cases addressing this precise issue, the Eleventh Circuit's decision in *Shotz* provides the most exhaustive and substantive analysis. The *Shotz* court began its analysis by considering the plain language of the anti-retaliation provision and applying traditional tools of statutory construction. 344 F.3d at 1166. The court found that the anti-retaliation provision contained explicit "rights-creating language" as well as "distinct duty-creating language." *Id.* at 1167–68. Importantly, the court focused on the fact that the statue prohibits retaliation by a "person." *Id.* Despite that language, the court concluded:

> That a statutory provision imposes such a duty on a class of actors, however, does not compel the further conclusion that individual members of that class are amenable to private suit or otherwise liable for a breach of that duty. For that, we must also examine the remedies created by the statute.

*Id.* at 1168–69. As mentioned above, Title II incorporates the remedial provisions of Title VI. The *Shotz* court thus turned to Title VI, but recognized that courts have generally determined that there is no individual liability under Title VI. *Id.* at 1169–71.

After analyzing the foregoing aspects of the statute, the court recognized that the

statutory scheme created a "dilemma":

> Did Congress intend the rights-and duty-creating language in the ADA anti-retaliation provision to, itself, countenance liability against individuals for its violation, or did Congress intend the remedies available for Title VI violations to control exclusively the type of relief available as well as the appropriate scope of liability? If Congress imbued the underlying remedial provisions with dispositive authority, both as to the persons against whom the remedy may be asserted and the type of relief available, individuals could not be privately sued under the anti-retaliation provision and we would not be allowed to read in another remedy. If, on the other hand, Congress intended that Title VI only fix authoritatively the type of relief available, and not the scope of liability, then it must have intended the language in § 12203 to control who would be liable for its violation.
>
> It is this congressional enigmatism and ill-defined statutory structure that distinguishes this case from those in which we, and other courts, have found that individual liability is precluded under other anti-discrimination provisions of both the ADA and comparable civil rights statutes. In each of those cases, the regulated entity was clearly defined in the statute, and that definition did not include individuals.

*Id.* at 1171–72.  The court then discussed how various courts had concluded that the remedial

provisions disposed of the apparent tension in the statute and that placing too much emphasis on

the word "person" in the anti-retaliation provision would frustrate the statutory scheme.  *Id.* at

1173.  The court, however, struggled with previous courts' willingness to simply read the word

"person" out of the statute.  *Id.*  The court expressed further concern with concluding that the

remedies of Title VI governed the scope of liability for retaliation involving public services

under Title II because to do so would be to "deviate considerably from the intent and purpose of

the statute."  *Id.* at 1174.  Moreover, unlike Title VI, which was enacted under the Spending

Clause, the ADA was enacted under the Fourteenth Amendment.  *Id.*  Accordingly, allowing

individual liability under Title II would not create the same difficulties "as doing so would under

Title VI."  *Id.*  The court therefore determined that Congress did not intend for it to rely on the

remedial provisions to the exclusion of the plain language of the anti-retaliation provision. *Id.* at 1175.

To "determine how the rights- and duty-creating language in the anti-retaliation provision work together with the remedial provisions to answer the question as to whether individual liability is permitted," the court next turned to the statute's legislative history. *Id.* at 1175–76. Nevertheless, the legislative history proved equally unhelpful, and the court found the statute to be "inscrutable." *Id.* at 1178. Consequently, the court resorted to agency deference by applying *Chevron* and concluded that, based on a Department of Justice interpretation of the anti-retaliation provision, "an individual may be sued privately in his or her personal capacity for violating [the anti-retaliation provision] in the public services context." *Id.* at 1178–80. Since the *Shotz* decision, several courts have come to the same conclusion. *Minkley v. Eureka City Sch.*, No. 17-CV-3241-PJH, 2017 WL 4355049, at *8 (N.D. Cal. Sept. 29, 2017); *Datto*, 664 F. Supp. 2d at 492; *Alston v. D.C.*, 561 F. Supp. 2d 29, 42 (D.D.C. 2008); *Zied-Campbell v. Richman*, No. CIV.A. 1:04-CV-0026, 2007 WL 1031399, at *18 (M.D. Pa. Mar. 30, 2007), *aff'd*, 428 F. App'x 224 (3d Cir. 2011);

The Glenns urge the court to adopt the Eleventh Circuit's reasoning in *Shotz*. Conversely, Defendants ask the court to apply the reasoning of cases such as *Espanola*. In *Espanola*, the court critiqued the *Shotz* decision because "it unties the ADA's retaliation provision from the specific remedies and procedures provided elsewhere in the statute." 2005 WL 5840479, at *12. After reviewing the relevant authority, the court finds *Shotz* and its progeny to be the most persuasive and so concludes that the Glenns can maintain their claim for retaliation under Title II of the ADA against the Individual Defendants.[2] The court is not

---

[2] Although the Tenth Circuit has not addressed the precise issue of individual liability for retaliation in the public services context, the Tenth Circuit has indicated the importance of the term "person" in the anti-retaliation

convinced that *Shotz* "unties" the retaliation provision from the remedies and procedures in the statute. This is so given that there is not "necessarily a conflict between § 12203(a) and the incorporated provisions of Title VI." *Datto*, 664 F. Supp. 2d at 492. For example:

> Courts have limited the scope of liability under Title VI to only entities actually receiving federal funds because the statute is based on the spending power. The authority for Title II of the ADA, however, is not the spending power, but § 5 of the Fourteenth Amendment. When the provisions of Title VI are incorporated into the ADA, through the enforcement provisions of § 12203 and Title II, they are no longer authorized by the spending clause, but by the Fourteenth Amendment, and therefore no longer need to be interpreted narrowly.

> If the provisions of Title VI, as incorporated into the ADA, are no longer interpreted as limited by the contours of the spending power, then there is no irreconcilable conflict between those provisions and the broad language of § 12203(a), and both can be interpreted to allow for individual liability. Such a result would harmonize both the liability and enforcement provisions of § 12203 and would accord with the interpretive regulations issued by the DOJ.

*Id.* (citations omitted). Therefore, having already decided above that the Glenns have stated a claim for retaliation under Title II against the District, the court likewise concludes that the Glenns have properly stated a claim for retaliation against the Individual Defendants.[3]

Finally, Defendants argue that regardless of whether the Glenns have stated a claim for retaliation generally, they have failed to do so against Anderson and Smith. More specifically, Defendants aver that the Glenns have failed to allege that Anderson and Smith engaged in an adverse action. On this point, the Complaint contains the following allegation: "Anderson, Mann, Smith and Garritson . . . prepared statements containing private and protected information

---

provision. *See Childs v. Nat'l Jewish Ctr. for Immunology & Respiratory Med.*, 129 F.3d 130 (10th Cir. 1997) ("Unlike the anti-discrimination provision in section 202 [of the ADA], the anti-retaliation provision in [§ 12203] applies to any 'person,' not just to public entities."). This tends to support the court's conclusion that there exists individual liability for retaliation in the context of Title II.

[3] Although the Individual Defendants do not assert qualified immunity as a defense to the Glenns' retaliation claim, it is a relevant inquiry here given that qualified immunity can apply when a defendant has allegedly "violated a constitutional *or statutory right*." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1184 (10th Cir. 2010) (emphasis added). Nevertheless, because the Individual Defendants do not raise it as a defense to this particular claim, the court will refrain from addressing it at this time.

with the intent that their statements would be shared with [Mr. Glenn's] employer." Compl. ¶

140. Defendants aver that despite this allegation, the Complaint fails to allege that the District

actually conveyed Anderson's and Smith's prepared statements to Mr. Glenn's employer. The

court, however, is unpersuaded. If Anderson and Smith specifically prepared statements that

contained private and protected information *with the intent* that they be shared with Mr. Glenn's

employer, then such conduct would be sufficient involvement to constitute participation in the

adverse action. Moreover, the Complaint alleges that Garritson shared with TSgt Monio

"multiple emails and statements from the Glenns and [School] and [District] personnel." Compl.

¶ 74. This suggests that Garritson conveyed the information that she received—including

information from Anderson and Smith—to TSgt Monio. Thus, because the court must accept the

foregoing allegations from the Complaint as true, the court finds that the Glenns have adequately

alleged that Anderson and Smith engaged in an adverse action and so are subject to individual

liability under the ADA.

Therefore, the court finds that the Glenns have stated a plausible claim for retaliation

against (1) the District under both Title II and Section 504 and (2) the Individual Defendants

under Title II.

## II.      Privacy Claim

The Glenns contend that the District and the Individual Defendants violated their

Fourteenth Amendment right to privacy by forwarding communications containing confidential

information, including E.G.'s educational record and disability status, to Mr. Glenn's employer.

The Glenns assert this claim pursuant to 42 U.S.C. § 1983. In response, Defendants contend that

(1) it is not clear whether informational privacy is protected under the Fourteenth Amendment;

(2) regardless of whether informational privacy is protected, the Individual Defendants are

entitled to qualified immunity; and (3) the Glenns have failed to allege adequate facts to state a claim against the District.

At the outset, the Tenth Circuit recently recognized that the Supreme Court "has never held that there is a constitutional right to prevent government disclosure of private information." *Leiser v. Moore*, 903 F.3d 1137, 1144 (10th Cir. 2018). Indeed, the issue of whether there exists a constitutional right to prevent the government from disclosing private information remains "an open question." *Id.* Given the Tenth Circuit's hesitancy in explicitly recognizing such a right, this court too will refrain from doing so. As such, the Glenns have failed to state a claim for a Fourteenth Amendment privacy violation under § 1983.

Notwithstanding the Tenth Circuit's decision in *Leiser*, the Glenns argue that Tenth Circuit precedent establishes that the government disclosure of a plaintiff's medical condition violates the Fourteenth Amendment. The precedent on which the Glenns rely is *Herring v. Keenan*, 218 F.3d 1171, 1173 (10th Cir. 2000) and *A.L.A. v. W. Valley City*, 26 F.3d 989, 990 (10th Cir. 1994). In both cases, the disclosure at issue involved whether the plaintiff was HIV positive. *See Leiser*, 903 F.3d at 1140–41 (discussing *Herring* and *A.L.A.*). However, *Leiser* clarified those holdings in light of more current Supreme Court precedent. In referring to *Herring* and *A.L.A.*, *Leiser* explained that "it is certainly unclear how far those opinions should be extended when we do not know the doctrinal boundaries of the protection against government disclosure." *Id.* at 1144. The court further clarified that it would be consistent with Tenth Circuit precedent "to say that disclosures are prohibited only when they shock the conscience" and such was the case in both *Herring* and *A.L.A.* given the government's disclosures that the plaintiffs were HIV positive were "vicious and outrageous." *Id.* at 1144–45. On this point, the *Leiser* court found a Second Circuit decision to be particularly helpful and relevant. *Id.* at 1145.

In *Matson v. Board of Education*, 631 F.3d 57, 58–60 (2d Cir. 2011), a teacher sued for the public disclosure of her fibromyalgia. In its decision, the Second Circuit, opined that "the interest in the privacy of medical information will vary with the condition," *id.* at 64, and that "[h]istorically, courts have considered on a case-by-case basis whether a disease was contagious or attributed in any way to socially repugnant conduct and whether it could be said that society as a whole views the disease as directly associated with any disease which might conceivably be characterized as loathsome," *Lesier*, 903 F.3d at 1145 (quoting *Matson*, 631 F.3d at 66). Accordingly, the court rejected the teacher's claim because fibromyalgia "would not 'bring about public opprobrium [or] expose a person to discrimination and intolerance.'" *Leiser*, 903 F.3d at 1145 (quoting *Matson*, 631 F.3d at 67 n.7).

Applying the reasoning from *Leiser* and *Matson* here, the court finds that the disclosures in *Herring* and *A.L.A.* are distinguishable from the disclosure at issue in this case. E.G.'s health conditions are ADHD and mild autism. Neither condition is of the type that would be considered "loathsome," nor would they bring about the type of "public opprobrium" described in *Matson*. Thus, because the court does not find the District's disclosure to be conscience shocking, the court concludes that the Glenns have failed to allege a constitutional privacy violation under the Fourteenth Amendment in support of their § 1983 claim.

Even if the Glenns has adequately articulated a privacy violation, the Individual Defendants would still be protected under the doctrine of qualified immunity. "The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)). "When a defendant raises the qualified-immunity defense, the onus is on the plaintiff to

demonstrate (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established *at the time of the challenged conduct*." *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (alteration in original) (internal quotation marks omitted), *cert. denied sub nom. Cummings v. Bussey*, No. 18-1357, 2019 WL 4921308 (U.S. Oct. 7, 2019). In undertaking this analysis, courts may address the two prongs in either order. *Id.* Because the Glenns have failed to establish the clearly-established prong of the qualified immunity test, the court will limit its analysis to the second prong. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he [or she] is doing violates that right." *Id.* (internal quotation marks omitted). To show that a right is clearly established, a plaintiff may either identify an on-point Supreme Court or Tenth Circuit decision, or demonstrate that the weight of authority from other courts clearly weighs in favor of the plaintiff's proposition. *Id.* While there need not be a case directly on point, "existing precedent must have placed the statutory or constitutional question [regarding the illegality of the defendant's conduct] beyond debate." *Id.* (alteration in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

As described above in *Leiser*, it is unclear as to whether there exists a constitutional right to informational privacy—let alone a clearly established one—under the Fourteenth Amendment. Given that the alleged disclosure in this case took place in 2017, and that the Tenth Circuit held that whether a constitution privacy right exists remains an open question in 2018, the court concludes that the Glenns have failed to establish that the Individual Defendants violated a clearly established constitutional right. Accordingly, the Individual Defendants are entitled to qualified immunity.

Regarding the District, even if the Glenns could establish that they have a constitutional right to informational privacy, they have failed to state a claim for municipal liability under § 1983. "Although Utah school districts are not immune from § 1983 suits in federal court, they are liable *only* if the violation of a plaintiff's federal rights results from an action taken under an official custom or policy." *Douglas v. Beaver Cty. Sch. Dist. Bd.*, 82 F. App'x 200, 202 (10th Cir. 2003) (emphasis added) (citation omitted). Moreover, a plaintiff must show that such a "policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).[4] Even without identifying an official policy, however, "actions taken by a municipality's final policymakers also represent acts of 'official policy' giving rise to municipal liability." *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007). "Accordingly, a municipality is responsible for both actions taken by subordinate employees in conformance with preexisting official policies or customs and actions taken by final policymakers, whose conduct can be no less described as the 'official policy' of a municipality." *Id.*

Here, the Complaint makes no mention of any District policy at all, let alone alleges that the Individual Defendants acted under a District custom or policy. The court must therefore turn to whether any of the Individual Defendants exercised final policymaking authority such that the District is liable for their actions. Although the Glenns aver that Anderson, Mann, and Garritson all exercised such authority, the court is unconvinced. Preliminarily, the Glenns do not dispute that, as a math teacher at the School, Smith did not exercise final policymaking authority on

---

[4] Importantly, "Section 1983 does not authorize liability under a theory of respondeat superior." *Schneider*, 717 F.3d at 767 (quoting *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011)). Accordingly, the District can only be held liable for the acts that it commits, i.e., for the policies it promulgates—not for independent acts by employees that are untethered to a District policy.

behalf of the District. As for the remaining Individual Defendants, the court finds that neither Anderson (a junior high math class supervisor for the District), Mann (the School's Vice Principal and 504 Coordinator), nor Garritson (the head of the School's counseling department) exercised final policymaking authority such that their decisions constituted acts of official policy on behalf of the District. While the court recognizes that each of the Individual Defendants' positions may have constituted supervisory roles to some degree, their positions are not of the type that would allow them to make final decisions for the District. As a result, the Glenns have failed to state a claim for municipal liability against the District.

Therefore, the court concludes that the Glenns have failed to state a § 1983 claim for an informational privacy violation under the Fourteenth Amendment because (1) no such right is definitively established; (2) the Individual Defendants are entitled to qualified immunity; and (3) they have failed to identify any District custom or policy that infringed upon their constitutional rights.

### III.  Failure to Train or Supervise Claim

For their final claim, the Glenns allege that the Supervisor Defendants failed to train or supervise the Individual Defendants, which resulted in a violation of their rights. While the Glenns assert this claim under § 1983, they fail to identify which constitutional or statutory rights the District or the Supervisor Defendants allegedly violated. "By its terms, of course, [§ 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). Thus, before a plaintiff can assert a claim under § 1983, he or she must first identify the specific right that has allegedly been violated. *See Mandy R. ex rel. Mr. & Mrs. R. v. Owens*, 464 F.3d 1139, 1147 (10th Cir.

2006) ("*Once* a plaintiff demonstrates that a statute creates a federal right, the right is

presumptively enforceable under § 1983." (emphasis added)).

To the extent the Glenns rely on FERPA, which they reference under the Fifth Cause of

Action in the Complaint, to support their § 1983 claim, the Supreme Court has held that

"FERPA's nondisclosure provisions contain no rights-creating language" and "therefore create

no rights enforceable under § 1983." *Gonzaga Univ. v.* Doe, 536 U.S. 273, 290 (2002). If,

however, the Glenns rely on the ADA and RA, although the Tenth Circuit has yet to address the

issue, several other Circuits have held that rights created exclusively under either statute "cannot

be vindicated through § 1983." *Williams v. Pennsylvania Human Relations Comm'n*, 870 F.3d

294, 300 (3d Cir. 2017) (ADA); *Tri–Corp Hous. Inc. v. Bauman*, 826 F.3d 446, 449 (7th Cir.

2016) (ADA and RA); *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002) (ADA and RA).[5]

The final right that the Glenns may be attempting to assert under this cause of action is

their alleged right to informational privacy under the Fourteenth Amendment. In order to state a

§ 1983 claim against a supervisor for failure to train or supervise, a plaintiff must "show an

'affirmative link' between the supervisor and the constitutional violation." *Schneider*, 717 F.3d

at 767 (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010)). Courts have

further broken this down into three elements which a plaintiff is "required to establish [for] a

successful § 1983 claim against a defendant based on his or her supervisory responsibilities: (1)

personal involvement; (2) causation, and (3) state of mind." *Id.* Here, the Glenns have failed to

establish any of these elements. Significantly, as described above, the Glenns have failed to

---

[5] The Circuit courts have reached this conclusion because even though independent federal rights exist under the ADA and RA, "Congress may choose to foreclose a remedy under § 1983, either by expressly 'forbidding recourse to § 1983 in the statute itself,' or by 'creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Williams*, 870 F.3d at 297–98 (quoting *Blessing v. Freestone*, 520 U.S. 329, 341 (1997)). Because the ADA and the RA already have comprehensive enforcement schemes, courts have determined that plaintiffs cannot enforce rights created explicitly under those statutes through a § 1983 claim. *See Id.* at 299–300.

allege that Defendants violated a constitutionally protected right to informational privacy. Thus, without a constitutional violation, the Glenns' claim against the Supervisor Defendants collapses. Furthermore, *Leiser* demonstrates that even if a right to informational privacy exists, it is not clearly established, which entitles the Supervisor Defendants to qualified immunity.

With regard to the "claim[] of inadequate hiring, training, or other supervisory practices" against the District, the Glenns "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 407 (1997)). Deliberate indifference, however, "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his [or her] action." *Id.* (internal quotation marks omitted). The standard can be satisfied when the institutional defendant has "actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation," and it chooses to disregard that risk. *Id.* In most cases, notice can be established by "proving the existence of a pattern of tortious conduct." *Id.* Although a plaintiff can still establish deliberate indifference without a pattern of "unconstitutional behavior," this can only occur under a "narrow range of circumstances" where "a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Id.* (internal quotation marks omitted).

Here, the court concludes that the Glenn's have not stated a failure to train or supervise claim against the District for several reasons. First, the Complaint does not adequately allege deliberate indifference on the part of the Supervisor Defendants or the District. Second, neither the District nor the Supervisor Defendants could have been on notice of a constitutional violation because it is unsettled as to whether there even is an informational privacy right under the

Fourteenth Amendment. Third, because there was no established constitutional right, there was no pattern of unconstitutional behavior. And even if the right was established, the Glenns have not suggested that there existed a pattern of unconstitutional privacy disclosures by District personnel. For these reasons, the court finds that the Glenns have failed stated a claim under § 1983 against the District for failure to train or supervise.

As a final matter, the Glenns request that should the court grant any portion of Defendants' motion, they be permitted leave to amend the Complaint to cure any of its defects. The court finds that allowing the Glenns to amend would be futile, however, because the Complaint's flaws are legal in nature, not factual. Accordingly, the court denies the Glenns' request.

## CONCLUSION

Based on the foregoing reasoning, Defendants' Motion to Dismiss Plaintiffs' Third, Fourth, and Fifth Causes of Action is hereby GRANTED in part and DENIED in part. Defendants' Motion is GRANTED as to (1) the retaliation claim against the Individual Defendants based on Section 504 of the RA; (2) the privacy claim; and (3) the failure to train or supervise claim, and those claims are dismissed with prejudice. Defendants' motion is DENIED as to the retaliation claim against (1) the District and (2) the Individual Defendants based on Title II of the ADA.

Dated this 23rd day of October, 2019.

BY THE COURT:

DALE A. KIMBALL,
United States District Judge